[Civ. No. 25336. Fourth Dist., Div. Two. Sept. 1, 1981.]

DONALD A. MILLER, Plaintiff and Appellant, v.
NATIONAL MEDICAL HOSPITAL OF MONTEREY PARK,
INC., Defendant and Respondent.

**COUNSEL**

Giles, Stewart & Barnett, Terry M. Giles, John D. Barnett, Monroe & Riddet and Keith C. Monroe for Plaintiff and Appellant.

Erwin & Anderholt and Michael J. Andelson for Defendant and Respondent.

**OPINION**

TAMURA, J.—Plaintiff, a physician, filed a petition for administrative mandamus (Code Civ. Proc., § 1094.5) seeking judicial review of his suspension from hospital staff privileges following his conviction of conspiracy to murder his wife. The trial court, having heard testimony and considered documentary evidence, concluded that defendant had pro-

ceeded fairly and acted within its discretion in suspending plaintiff's staff privileges and denied the petition.

Under Code of Civil Procedure section 1094.5, subdivisions (c) and (d),[1] the standard of judicial review of a decision of a private hospital board is whether the board's findings are "supported by substantial evidence in light of the whole record." The standard of review on appeal is identical; it is whether there is substantial evidence to support the decision of the administrative body. (E.g., *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 916 [80 Cal.Rptr. 89, 458 P.2d 33]; see *City of Carmel-by-the-Sea* v. *Board of Supervisors* (1977) 71 Cal. App.3d 84 [139 Cal.Rptr. 214].) With these standards in mind, we turn to the facts of the case at bench:

Plaintiff was convicted of conspiracy to murder his wife. (Pen. Code, §§ 182, 187.) Plaintiff subsequently received a letter from the administrator of Indio Community Hospital where he enjoyed staff privileges, informing him that a request for corrective action against him pursuant to the professional staff bylaws[2] had been received by the hospital's administrative committee. The letter stated that the request arose from his felony conviction, and that he might attend the administrative committee meeting to explain why he should not be disciplined. Since the meeting was to be informal, plaintiff was told that he might not have an attorney or other medical staff member attend the hearing as his advocate.

Present at the administrative committee meeting to consider the request for corrective action against plaintiff were plaintiff, the hospital

---

[1]Code of Civil Procedure section 1094.5, subdivisions (c) and (d), provide: "(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.

"(d) Notwithstanding the provisions of subdivision (c), in cases arising from private hospital boards, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record. Provided, however, in all cases in which the petition alleges discriminatory actions prohibited by Section 1316 of the Health and Safety Code, and the plaintiff makes a preliminary showing of substantial evidence in support of such allegation, the court shall exercise its independent judgment on the evidence and abuse of discretion shall be established if the court determines that the findings are not supported by the weight of the evidence."

[2]The professional staff bylaws pertinent to this appeal are set forth in exhibit A attached hereto.

administrator, and the members of the administrative committee. According to article VII, section 1, subdivision (a), of the professional staff bylaws (see exhibit A) the committee was to consider whether plaintiff's "activities or professional conduct . . . [were] . . . lower than the standards or aims of the professional staff or . . . [were] . . . disruptive to the operation of the hospital" so as to require corrective action to be taken against him. Subdivision (a) directed that a corrective action request must set out "specific activities or conduct which constitute the grounds for the request (e.g., unprofessional conduct, immoral conduct, unethical practice, conviction of a felony, incompetency, failure to keep adequate records, failure to abide by these Bylaws, etc.)." If the administrative committee concluded that plaintiff had engaged in conduct lower than the standards of the professional staff or disruptive to the hospital, it was authorized by subdivision (d) of article VII (see exhibit A) to recommend to the hospital's governing board corrective action ranging from issuance of a warning to suspension or revocation of staff membership.

The administrative committee was apprised of the verdict in plaintiff's trial for conspiracy to murder, and heard plaintiff's explanation in which he acknowledged that he had done some acts toward soliciting the murder of his wife but attempted to explain that there were extenuating circumstances surrounding these acts. The administrative committee then asked plaintiff to leave and, after deliberating on the corrective action request, voted to recommend to the governing board that plaintiff's staff membership be revoked. Plaintiff was notified of the decision by letter and told that pursuant to article VIII, section 2, subdivision (b), of the professional staff bylaws (see exhibit A), he might request a hearing before the hospital's judicial review committee.

Plaintiff made a timely written request for a judicial review committee hearing. In his request he objected to the usual procedure for selecting judicial review committee members set out in article VIII, section 4, subdivision (a)(1) of the bylaws.[3] He voiced his fear that some of those selected for the committee would be people who had openly stated their dislike for and bias against him, and argued that administrative committee members should not serve on the committee because they had already considered and voted on the issue of corrective action against him. Plaintiff also requested that either a court reporter or tape record-

---

[3]This subdivision provides that the administrative committee choose three of its own members for the review committee, and the governing board two of its own members. (See exhibit A.)

er be employed to make a record of the hearing. Finally, plaintiff demanded that, should the hospital be represented by an attorney at the hearing, he also be allowed to have legal counsel present.

The administrative committee and governing board acquiesced to all of plaintiff's requests. The personnel for the judicial review committee were chosen from professional staff members who were not serving on either the administrative committee or the governing board, so that neither those who had already considered the facts of plaintiff's case (administrative committee members) nor those who might review the case in future (governing board members) would consider the case at the judicial review committee stage of the proceedings. The judicial review committee decided that both the hospital staff and plaintiff might be represented by legal counsel at the hearing, and plaintiff was urged to retain an attorney for the hearing. A court reporter was engaged for the hearing. In addition, the judicial review committee permitted plaintiff to approve or disapprove its choice of a hearing officer, though this was not required by the bylaws and plaintiff had not requested such approval power.

A local attorney named Philip Flame was chosen as hearing officer for the judicial review committee hearing. His role was to preside, to counsel on procedure, and to rule on the admissibility of evidence. He was not to participate in the substance of deliberations or to vote.

On the day of the hearing, plaintiff orally informed Mr. Flame that he objected to two members of the judicial review committee, Dr. Dickerson and Dr. Green, on the basis of actual bias. Dr. Dickerson withdrew voluntarily from the hearing. Mr. Flame allowed Dr. Green to participate after talking with him and determining that there was no factual basis for the bias charge.

Plaintiff, who represented himself at the judicial review committee hearing, advanced a number of arguments for overturning the administrative committee's decision. He argued that the committee should not have acted until he had exhausted his criminal appeals on the felony conviction, that no action should be taken against him until and unless the Board of Medical Quality Assurance acted to discipline him and

that the administrative committee erred in disciplining him because the felony of which he was convicted bore no relation to the qualifications, functions and duties of a physician or his competence in caring for his patients. He argued that at least one member of the administrative committee personally disliked him and was out to get him. Plaintiff also testified on his own behalf. He again acknowledged that he had done some acts towards soliciting the murder of his wife, recounted his remorse and the actions he took to halt the process he had initiated, and explained his belief that the acts had no relation to the practice of medicine.

The administrative committee was represented at the judicial review hearing by an attorney and by one of its members (Dr. Carlson). The committee introduced those portions of the information returned against plaintiff in the Indio Superior Court which accused him of conspiracy to commit murder.[4] Several people who had attended the

---

[4]The relevant portions of the information provide:

"COUNT II

"For a further and separate cause of action, being a different offense of the same class of crime and offense as the charges set forth in Count I hereof, the District Attorney of the County of Riverside, State of California, hereby accuses DONALD ALAN MILLER and LEROY FREEMAN of a felony, to wit: Violation of Section 182 of the Penal code during the period from December 20, 1978 through January 4, 1979 in the County of Riverside, State of California, they did wilfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of murder, in violation of Section 187 of the Penal Code, a felony, that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the County of Riverside:

"OVERT ACT NO. 1

"On or about December 27, 1978, the informant met Dr. Donald Miller at Dr. Miller's office on Miles Avenue in Indio, California.

"OVERT ACT NO. 2

"On or about December 17, 1978, Dr. MILLER had a conversation with the informant concerning when Dr. Miller could have his wife, Susan, killed.

"OVERT ACT NO. 3

"On or about December 27, 1978, LEROY FREEMAN told William Russell he (FREEMAN) worked for a doctor who would pay $5000 to Russell through FREEMAN to kill the doctor's wife.

"OVERT ACT NO. 4

"On or about December 29, 1978 LEROY FREEMAN took William Russell to Dr. MILLER's residence in Bermuda Dunes and told Russell this was the doctor's house and was where Russell was to kill MILLER's wife.

administrative committee meeting at which plaintiff's corrective action was decided testified at the judicial review committee hearing. The hospital administrator (not a voting member of the committee) and two physician members of the committee (Drs. Curry and Carlson) testified that the basis for the committee's decision was not plaintiff's conviction of the felony of conspiracy to murder, but that the crime was of such a nature that it was incompatible with the ethical and professional goals of a physician—those of upholding the dignity and sanctity of human life and of alleviating suffering. The hospital administrator also testified that plaintiff's conviction had received widespread publicity which might disrupt the operations of the hospital. He recounted two phone calls he had received from unidentified community members stating that they would not utilize the hospital's facilities if something were not done to remove plaintiff from the staff. The member physicians also testified that the committee had not considered the question of plaintiff's competence to treat patients in its deliberations, but had confined itself to the issue of the compatibility of his felonious behavior with the aims and goals of the hospital staff.

After the administrative committee and plaintiff had presented their cases, the judicial review committee retired to deliberate. Since it was feared that one of the five regular members of the review committee might be called away during deliberations, the alternate (Dr. Dorfman) was allowed to participate in the deliberations, though he was not permitted to vote. The judicial review committee decided that plaintiff's hospital privileges should be suspended pending the outcome of his criminal appeals, and that if the conviction were reversed he should automatically resume active staff membership.

---

"OVERT ACT NO. 5

"On or about January 2, 1979, LEROY FREEMAN gave William Russell $4000 in partial payment for the killing of Dr. MILLER's wife.

"OVERT ACT NO. 6

"On or about January 3, 1979 LEROY FREEMAN gave William Russell an additional $1000 in payment for the killing of Dr. MILLER's wife.

"OVERT ACT NO. 7

"On or about January 4, 1979, DONALD MILLER acknowledged to William Russell that he had given $5000 to LEROY FREEMAN to secure the killing of his wife and stated that $1000 more might be available for such purpose."

The judicial review committee's recommendation was forwarded to the governing board[5] as had been the administrative committee's recommendation. The governing board tentatively decided to accept the judicial review committee's suspension recommendation. However, because such a decision would differ from the administrative committee's recommendation, the governing board was required by article VIII, section 6, subdivision (a), of the bylaws (see exhibit A) to submit its tentative decision for review by an ad hoc committee made up of three members of the governing board and two members of the administrative committee.[6] The ad hoc committee, which included Drs. Green, Dickerson and Carlson, recommended that plaintiff's staff membership be revoked. However, the governing board's final decision was to suspend plaintiff's staff membership pending the outcome of his criminal appeals and that his membership be reconsidered (but not automatically reinstated) if the conviction were "modified."

Plaintiff filed a petition for writ of mandate/prohibition or in the alternative/administrative mandamus in the superior court. In his petition, he alleged that defendant failed to afford him fair procedure and that the decision to suspend him from hospital staff membership was capricious, arbitrary, and an abuse of defendant's discretion. The trial court entered judgment denying the petition.

On appeal, plaintiff contends initially that defendant violated his right to fair procedure, arguing that he was judged by individuals who were either actually biased against him or had a high probability of being biased against him. Plaintiff next contends that defendant cannot suspend his staff privileges until his appeals from the conviction have been exhausted. Plaintiff also maintains that the crime of conspiracy to murder one's wife is not substantially related to the qualifications, functions and duties of a physician. Finally, plaintiff contends that the bylaw calling for corrective action if a physician's activities are "lower than the standards or aims of the professional staff" is unconstitutionally vague.

---

[5]Because of the way in which the judicial review committee had been selected, no members of the governing board had been involved in the earlier considerations of corrective action against plaintiff.

[6]Plaintiff states in his brief that the ad hoc committee was not constituted as required by the bylaws, but this is not borne out by the record.

# I

## FAIR PROCEDURE

■ It is now well established "that membership decisions of hospital staff associations, whether in public or private hospitals, 'must be rendered pursuant to minimal requisites of fair procedure required by established common law principles.'" (*Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 825 [140 Cal.Rptr. 442, 567 P.2d 1162], quoting *Ascherman v. Saint Francis Memorial Hosp.* (1975) 45 Cal.App.3d 507, 511 [119 Cal.Rptr. 507].) These "minimal requisites," though they vary depending on the situation being considered, appear to include adequate notice of charges, a reasonable opportunity to respond, and an impartial tribunal in the event that an administrative hearing is required. (*Ezekial v. Winkley* (1977) 20 Cal.3d 267, 278-279 [142 Cal.Rptr. 418, 572 P.2d 32]; *Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657 [163 Cal.Rptr. 831]; see *People v. Ramirez* (1979) 25 Cal.3d 260, 268-269 [158 Cal.Rptr. 316, 599 P.2d 622] [prerequisites of minimal due process]; Sloss & Becker, *The Organization Affected with a Public Interest and Its Members* (1978) 29 Hastings L.J. 99.)

In the case at bench, plaintiff contends that defendant failed to provide him with impartial tribunals in considering disciplinary action against him. He argues that the various committees which considered the charges against him contained members who were actually biased against him and who acted on this prejudice to persuade others to vote against his continued staff membership. Relying on *Applebaum v. Board of Directors, supra*, 104 Cal.App.3d 648, 659, in which the instigator of charges against a practitioner was a member of the investigating committee, and in which there was significant overlap between the initial and final adjudicative bodies (5 of 12 members), causing the appellate court to conclude that there was a "practical probability of unfairness" even in the absence of actual bias, plaintiff argues that the overlap of members in the administrative committee and ad hoc committee and on the governing board raised a practical probability of unfairness and thus denied him his right to fair procedure. The contention lacks merit.

Plaintiff received the benefit of the independent judgment of a large percent of the hospital's medical staff members in the determination of

his medical staff status. There was no overlapping of membership in the administrative committee, judicial review committee, or governing board. Indeed, defendant suspended its bylaws at plaintiff's request to avoid duplication of membership of these committees. Only the ad hoc committee was at all duplicative, and its recommendation was eventually rejected by the governing board. Though plaintiff alleged actual bias against Drs. Green, Dickerson, Carlson and Dorfman at various stages of this procedure, the record fails to substantiate these allegations. Moreover, plaintiff received adequate notice of both the administrative committee meeting and judicial review committee hearing, had an opportunity to be heard in his defense before both tribunals, was allowed to present evidence and have counsel at the judicial review committee hearing and to participate in the choice of an administrative hearing officer.[7]

Plaintiff received the fair and impartial judgment of those who participated in determining his medical staff membership status and was afforded fair procedure under law. Indeed, defendant bent over backwards to afford plaintiff a fair and impartial hearing and review.

## II

### Suspension Pending Criminal Appeals

Plaintiff contends that defendant cannot legally suspend his staff membership because of his felony conviction until his appeals from the conviction have been exhausted. Without citing any authorities on this point, plaintiff maintains that suspension of his hospital privileges before the judgment against him becomes final is an unconstitutional deprivation of his right to fully practice his profession and a failure to recognize his constitutionally guaranteed appellate and due process rights. The contentions are without merit.

Staff membership in a private hospital is governed by the hospital's bylaws, subject to the requirements of common law fair procedure and substantive due process. (See, e.g., *Miller* v. *Eisenhower Medical Center* (1980) 27 Cal.3d 614 [166 Cal.Rptr. 826, 614 P.2d 258]; *Ezekial* v. *Winkley, supra,* 20 Cal.3d 267; *Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d 802.) Defendant is properly concerned with the

---

[7]Plaintiff was not represented by counsel at the judicial review committee hearing but he had previously been informed that he was entitled to be represented by counsel at that hearing and was advised to do so.

maintenance of the goals and aims of its professional staff, and with avoiding disruption of hospital operations. Defendant, after according plaintiff a full and fair administrative hearing, determined that plaintiff's conviction of conspiring to murder his wife undermines those goals and aims and disrupts hospital functioning and that plaintiff's privileges should be suspended pending the outcome of his appeal of the criminal conviction. We find no irrationality or unreasonableness in the disciplinary action taken. Indeed it represents a fair balancing of the interests of the hospital against plaintiff's right to practice his profession.[8] The demands of substantive or procedural due process do not require defendant to keep plaintiff on active status until his judgment of conviction becomes final.[9]

Nor does suspension from the hospital medical staff infringe upon plaintiff's right to appeal his criminal conviction. The right of appeal in the criminal matter does not encompass plaintiff's right to have his hospital privileges undisturbed until all appeals are exhausted. It only assures appellate review of his criminal conviction. Plaintiff's suspension from the hospital staff in no way impairs the exercise of that right.

### III

#### SUBSTANTIAL RELATIONSHIP OF CONSPIRACY TO MURDER TO THE PRACTICE OF MEDICINE

Plaintiff contends that the crime of conspiracy to murder one's wife is not substantially related to the qualifications, functions and duties of a physician so that defendant abused its discretion and exceeded its jurisdiction in suspending him from the hospital staff for conviction of such an act. This contention is likewise totally lacking in merit.

---

[8]The State Bar Act expressly provides for suspension upon the attorney's conviction of a crime involving moral turpitude. (Bus. & Prof. Code, § 6102; *In re Phillips* (1936) 17 Cal.2d 55, 57 [109 P.2d 344, 132 A.L.R. 644].)

[9]In his reply brief, plaintiff concedes that the Board of Medical Quality Assurance may take disciplinary action involving suspension or probation of a physician pending appeal from a criminal conviction. We note also that our Supreme Court *must* temporarily suspend an attorney from practice pending appeal from conviction of a crime involving moral turpitude upon receipt of a certified copy of the record of his or her conviction. (Bus. & Prof. Code, §§ 6101, 6102; see also, Annot., 76 A.L.R.3d 1061.) We know of no authority which requires a higher standard of due process of a private association dispensing professional privileges than of a public entity concerned with professional licensure. Imposition of a rule such as that urged by plaintiff might well result in the anomaly of a physician having the protected right to practice at a certain hospital but being duly suspended from licensure to practice.

That defendant acted reasonably and well within its discretion and jurisdiction is supported by substantial evidence. Two of the physician members of the administrative committee and the hospital administrator testified at the judicial review committee hearing that the administrative committee's recommendation was based on its determination that the crime of conspiracy to commit murder was incompatible with, and indeed abhorrent to, the aims and goals of the hospital and a physician's responsibility to alleviate suffering and uphold the dignity and sanctity of human life. As one of the witnesses pointed out, the crime violated the very tenets of the Hippocratic oath. Defendant's decision that a substantial relationship exists between the crime of conspiracy to murder and the qualifications, functions, and duties of a physician was amply supported by the record. Defendant did not abuse its discretion or exceed its jurisdiction in suspending plaintiff's staff membership.

## IV

### Vagueness of the Bylaw

■ Finally, plaintiff maintains that the clause "[w]henever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the Professional Staff," set out in article VII, section 1, subdivision (a) of defendant's bylaws (see exhibit A) is "so overbroad, ambiguous, and obviously vague" that a physician might be arbitrarily and capriciously removed from the hospital staff under its aegis, and that consequently the bylaw is invalid. This contention must also be rejected.

A private hospital may not adopt rules for suspension or revocation of staff membership which permit action on an arbitrary or irrational basis (*Miller* v. *Eisenhower Medical Center, supra*, 27 Cal.3d 614, 626), and its bylaws must be read to require a demonstrable nexus between the activities or professional conduct cited as the basis for corrective action and established professional standards or aims of the hospital's medical staff. (*Id.*, at p. 628.) In the bylaw in question the operative clause "activities . . . lower than the standards or aims of the Professional Staff" standing alone may appear vague and overbroad but the clause must be interpreted in light of the numerous specific examples of such conduct set out in the bylaw: "unprofessional conduct, immoral conduct, unethical practice, conviction of a felony, incompetency, failure to keep adequate records, failure to abide by these Bylaws, . . . "

This amplification, together with the bylaw requirement that requests for corrective action must refer to one or more of the specifically enumerated activities or courses of conduct, dispel any vagueness or ambiguity which might otherwise be inherent in the clause standing alone. When read and interpreted as a whole, the bylaw in question is not void for vagueness nor does it permit disciplinary action on an arbitrary or irrational basis.

Judgment affirmed.

Gardner, P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied September 21, 1981, and appellant's petition for a hearing by the Supreme Court was denied November 18, 1981.

EXHIBIT "A"
The Professional Staff Bylaws pertinent to this appeal:

### ARTICLE VII: CORRECTIVE ACTION
*Section 1.* PROCEDURE

(a) Whenever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the Professional Staff or to be disruptive to the operation of the hospital, corrective action against such practitioner may be requested by any member of the Professional Staff, by the chief of any service, by the chairman of any standing committee of the Professional Staff, by the Hospital Administrator or by the Governing Body. All requests for corrective action shall be in writing, shall be made to the Administrative Committee and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request (e.g., unprofessional conduct, immoral conduct, unethical practice, conviction of a felony, incompetency, failure to keep adequate records, failure to abide by these Bylaws, etc.).

(b) Whenever the corrective action could be a reduction or suspension of clinical privileges, the Administrative Committee shall investigate the matter.

(c) Within fifteen (15) days following receipt of a request for corrective action involving reduction or suspension of clinical privileges, the Administrative Committee shall take action upon the request. If the corrective action should involve a reduction or suspension of clinical privileges, or a suspension or expulsion from the Professional Staff, the affected practitioner shall be permitted to make an appearance before the Administrative Committee prior to its taking action on such request. This appearance shall not constitute a hearing, shall be preliminary in nature and none of the procedural rules provided in these Bylaws with respect to hearings shall apply thereto. A record of such appearance shall be made by the Administrative Committee.

(d) The action of the Administrative Committee on a request for corrective action may be to issue a warning, a letter of admonition or reprimand, to impose terms of probation or a requirement for a consultation, to recommend reduction, suspension or

revocation of clinical privileges, to recommend that privileges be terminated, modified or sustained or to recommend that the practitioner's staff membership be suspended or revoked.

(e) Any recommendation by the Administrative Committee for reduction, suspension or revocation of clinical privileges, or for suspension or expulsion from the Professional Staff shall entitle the affected practitioner to the procedural rights provided in Article VIII of these Bylaws.

(f) The Chairman of the Administrative Committee shall promptly notify the Hospital Administrator in writing of all requests for corrective action received by the Administrative Committee and shall continue to keep the Administrator fully informed of all action taken in connection therewith. After the Administrative Committee has made its recommendation in the matter, the procedure to be followed shall be as provided in Article V, Section 2 and Article VIII, if applicable, of these Bylaws.

ARTICLE VIII: HEARING AND APPELLATE REVIEW PROCEDURE
*Section 1.* RIGHT TO JUDICIAL HEARING

(a) When any practitioner receives notice of a decision of the Governing Body or a recommendation of the Administrative Committee that, if ratified by decision of the Governing Body will adversely affect his appointment to or status as a member of the Professional Staff or his exercise of clinical privileges, he shall be entitled to an informal hearing before the Administrative Committee of the Professional Staff, as provided in Article VII, Section I (c). If the recommendation of the Administrative Committee following such hearing is still adverse to the affected practitioner, he shall then be entitled to a hearing by the judicial review committee before the Governing Body makes a final decision on the matter.

(b) All hearings shall be in accordance with the procedural safeguards set forth in this Article VIII to assure that the affected practitioner's rights are not violated.

*Section 2.* REQUEST FOR HEARING

(a) The Hospital Administrator shall be responsible for giving written notice within four (4) working days of an adverse recommendation or decision to any affected practitioner who is entitled to a hearing, by certified mail, return receipt requested.

(b) Within ten (10) days after receipt of a notice by an affected practitioner of an adverse recommendation or decision made or adhered to after a hearing as above provided, he may, by written notice to the Governing Board delivered through the Hospital Administrator by certified mail, return receipt requested, request a hearing before the judicial review committee to seek reconsideration of his case on the basis that the decision was in error, unreasonable, arbitrary or capricious.

(c) If such judicial review committee hearing is not requested within ten (10) days after receipt of a notice by the affected practitioner, the affected practitioner shall be deemed to have waived his right to same and to have accepted such adverse recommendation or decision, and the same shall become effective as provided in Section 2 of this Article VIII.

(d) The failure of a practitioner to request a hearing to which he is entitled by these Bylaws within time specified and in the manner herein provided shall be deemed to be a waiver of his right to such hearing and to the right to appeal.

(e) When the hearing waived relates to an adverse recommendation of the Administrative Committee of the Professional Staff or decision of the Governing Body, the same shall thereupon become and remain effective against the practitioner in the same manner as a final decision of the Governing Body provided for in Section 6 of this Article VIII. In either of these events, the Hospital Administrator shall promptly notify the affected practitioner of his status by certified mail, return receipt requested.

*Section 3.* NOTICE OF HEARING

(a) Within ten (10) days after receipt of a request for hearing from a practitioner entitled to same, the Administrative Committee or the Governing Body, whichever is

appropriate, shall schedule and arrange for such a hearing and shall, through the Hospital Administrator, notify the practitioner of the time, place and date so scheduled, by certified mail, return receipt requested. The hearing date shall be not less that five (5) days nor more than thirty (30) days from the date of receipt of the request for hearing provided, however, that a hearing for a practitioner who is under suspension which is then in effect shall be held as soon as arrangements therefore [*sic*] may reasonably be made, but not later than thirty (30) days from the date of receipt of such practitioner's request for hearing.

(b) The notice of hearing shall state in concise language the acts or omissions with which the practitioner is charged, a list of specific or representative charts being questioned, the other reasons or subject matter that was considered in making the adverse recommendation or decision, and the rights to which the practitioner is entitled, including the right to legal counsel.

(c) Both parties should be allowed the necessary time to present the matter in an orderly fashion.

(1) A representative of the Administrative Committee shall state the facts in support of its recommendation.

(2) The appellate practitioner may file a written answer to support his contention as well as present oral evidence at the hearing.

(3) The appellate practitioner shall not be entitled to appear with legal representation but the judicial review committee may permit such representation on such terms and conditions as it may impose at the time.

*Section 4.* COMPOSITION OF JUDICIAL REVIEW COMMITTEE

(a) The Judicial Review Committee shall have as its sole function the review of cases in the nature of an appeal of matters referred to it by the Administrative Committee or the Governing Body as outlined in this Article VIII.

(1) The Governing Body shall appoint two members of the Governing Board; the Administrative Committee shall appoint three of its committee members (not including the Chief of Staff); and the committee shall consist of five members. Alternates may be appointed to replace absentees.

(2) The Governing Board shall select a hearing officer who may or may not be a member of the Professional Staff and who may or may not be an attorney at law, to preside at the hearing and to perform the duties of a hearing officer. He may participate in the deliberations of the Judicial Review Committee and be the advisor to the procedure, but shall not vote.

(b) When a hearing relates to an adverse recommendation of the Governing Body or Administrative Committee, such hearing shall be conducted by the Judicial Review Committee with not less than its five members present. No staff member who has actively participated in the consideration of the adverse recommendation shall be appointed a member of the Judicial Review Committee unless it is otherwise impossible to select a representative group due to the size of the professional staff.

*Section 5.* CONDUCT OF THE HEARING

(a) Oral evidence shall be taken only on oath or affirmation.

(b) Each party shall have these rights:

(1) To call and examine witnesses.

(2) To cross-examine opposing witnesses on any matter relevant to the issue, even though the matter was not covered by direct examination. The hearing officer shall rule on questions of evidence.

(3) To impeach any witness regardless of which party first called him to testify.

(4) To introduce exhibits and written evidence.

(5) To rebut the evidence against him.

(c) If the respondent practitioner does not testify in his own defense, he may be examined as if under cross-examination.

(d) Only those present may vote. No proxies permitted.

(e) An accurate record of all hearings must be taken. The mechanism shall be established by the Judicial Review Committee, and may be accomplished by the use of a court reporter, electronic recording unit, detailed transcription or by the taking of adequate minutes. A copy of these records shall be made available to the practitioner. The costs incurred by such hearings shall be the responsibility of the hospital.

(f) No hearing shall be conducted without the personal presence of the practitioner for whom the hearing has been scheduled unless he waives such appearance in writing or fails without good cause to appear for the hearing after appropriate notice. A practitioner who fails without good cause to appear and proceed at such hearing shall be deemed to have waived his rights in the same manner as provided in Section 2 of this Article VIII and to have voluntarily accepted the adverse recommendation or decision involved, and the same shall thereupon become and remain in effect as provided in said Section 2.

(g) Postponements of hearings beyond the time set forth in these Bylaws shall be made only with the approval of the hearing committee.

(h) The affected practitioner shall be entitled to be accompanied by and/or represented at the hearing by a member of the Professional Staff in good standing or by a member of his local professional society.

(i) The hearing officer of the Judicial Review Committee, or his designee, shall preside over the hearing to determine the order of procedure during the hearing, to assure that all participants in the hearing have a reasonable opportunity to present relevant oral and documentary evidence and to maintain decorum.

(j) The hearing need not be conducted strictly according to rules of law relating to examination of witnesses or presentation of evidence. Any relevant matter upon which responsible persons customarily rely in the conduct of serious affairs shall be considered, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil or criminal action. The practitioner for whom the hearing is being held shall, prior to or during the hearing, be entitled to submit memoranda concerning any issue of procedure or of fact and such memoranda shall become a part of the hearing record.

(k) The Administrative Committee, when its action is the subject of the hearing, shall appoint one of its members or some other Professional Staff member to represent it at the hearing, to present the facts in support of its adverse recommendation and to examine witnesses. The Governing Body, when its action is the subject of the hearing, shall appoint one of its members to represent it at the hearing to present the facts in support of its adverse decision and to examine witnesses. It shall be the obligation of such representative to present appropriate evidence in support of the adverse recommendation or decision by an appropriate showing that the charges or grounds involved lack any factual basis or that such basis of the action taken thereon is either arbitrary, unreasonable or capricious.

(l) The hearings provided for in these Bylaws are for the purpose of intraprofessional resolution of matters bearing on professional competency and conduct. Accordingly, neither the affected practitioner nor the Administrative Committee of the Professional Staff or the Governing Body shall be represented at any phase of the hearing procedure by an attorney at law unless the hearing committee, in its discretion, permits both sides to be represented by legal counsel. The foregoing shall not be deemed to deprive the practitioner, the Administrative Committee of the Professional Staff or the Governing Body of the right to legal counsel in connection with the preparation for the hearing and if a hearing officer is utilized, he may be an attorney at law.

(m) The hearing committee may, without special notice, recess the hearing and reconvene the same for the convenience of the participants or for the purpose of obtaining new or additional evidence or consultation. Upon conclusion of the presentation of oral and written evidence, the hearing shall be closed. The hearing committee may thereupon, at a time convenient to itself, conduct its deliberations outside the presence of the practitioner for whom the hearing was convened.

(n) Within fifteen (15) days after the final adjournment of the hearing, the hearing committee shall make a written report and recommendation and shall forward the same together with the hearing record and all other documentation to the Administrative Committee of the Professional Staff and to the Governing Body. Thereafter, the procedure to be followed shall be as provided in Section 2 (h) of Article V of these Bylaws.

*Section 6.* FINAL DECISION OF GOVERNING BODY

(a) Within ten (10) days after the conclusion of the Judicial Review Committee hearing, the Governing Body shall make its final decision in the matter and shall send notice thereof to the Administrative Committee and, through the Administrator, to the affected practitioner, by certified mail, return receipt requested. If this decision is in accordance with the Administrative Committee's last recommendation in the matter, it shall be immediately effective and final, and shall not be subject of further hearing or appellate review.

If this decision is contrary to the Administrative Committee's last recommendation, the Governing Body shall refer the matter to an *ad hoc* committee for further review and recommendation within ten (10) days, and shall include with such notice of its decision a statement that the decision is tentative and that a final decision will not be made until the *ad hoc* committee's recommendation has been received. The *ad hoc* committee shall be appointed by the Chairman of the Governing Board and shall consist of two members of the Administrative Committee and three members of the Governing Board. At its next meeting after receipt of the *ad hoc* committee's recommendation, the Governing Body shall make its own final decision with like effect and notice as first provided in this Section 6.

(b) Notwithstanding any other provisions of these Bylaws, no practitioner shall be entitled as a right to more than one informal Administrative Committee hearing and one appeal to the Judicial Review Committee for a hearing on any matter which shall have been the subject of action by the Administrative Committee of the Professional Staff, or by a duly authorized committee of the Governing Body, or both.